# HUNT, GOVERNOR OF NORTH CAROLINA, ET AL. *v.* CROMARTIE ET AL.

No. 98–85.   Argued January 20, 1999—Decided May 17, 1999

542

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and KENNEDY, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post*, p. 555.

*Walter E. Dellinger* argued the cause for appellants. With him on the briefs were *Michael F. Easley*, Attorney General of North Carolina, *Edwin M. Speas, Jr.*, Chief Deputy Attorney General, *Tiare B. Smiley*, Special Deputy Attorney General, and *Melissa L. Saunders*. *Todd A. Cox*, *Adam Stein*, *Elaine R. Jones*, *Theodore M. Shaw*, *Norman J. Chachkin*, *Jacqueline A. Berrien*, and *Victor A. Bolden* filed briefs for appellants-intervenors Smallwood et al.

*James A. Feldman* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Waxman*, *Acting Assistant Attorney General Yeomans*, *Deputy Solicitor General Underwood*, *David K. Flynn*, and *Louis E. Peraertz*.

*Robinson O. Everett* argued the cause for appellees. With him on the brief was *Martin G. McGee*.\*

---

\*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union by *Laughlin McDonald*, *Neil Bradley*, *Cristina Correia*, and *Steven R. Shapiro;* for the Brennan Center for Justice at

JUSTICE THOMAS delivered the opinion of the Court.

In this appeal, we must decide whether appellees were entitled to summary judgment on their claim that North Carolina's Twelfth Congressional District, as established by the State's 1997 congressional redistricting plan, constituted an unconstitutional racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment.

I

This is the third time in six years that litigation over North Carolina's Twelfth Congressional District has come before this Court. The first time around, we held that plaintiffs whose complaint alleged that the State had deliberately segregated voters into districts on the basis of race without compelling justification stated a claim for relief under the Equal Protection Clause of the Fourteenth Amendment. *Shaw* v. *Reno,* 509 U. S. 630, 658 (1993) *(Shaw I).* After remand, we affirmed the District Court's finding that North Carolina's District 12 classified voters by race and further held that the State's reapportionment scheme was not narrowly tailored to serve a compelling interest. *Shaw* v. *Hunt,* 517 U. S. 899 (1996) *(Shaw II).*

In response to our decision in *Shaw II,* the State enacted a new districting plan. See 1997 N. C. Sess. Laws, ch. 11. A map of the unconstitutional District 12 was set forth in the Appendix to the opinion of the Court in *Shaw I, supra,* and we described it as follows:

"The second majority-black district, District 12, is . . . unusually shaped. It is approximately 160 miles long and, for much of its length, no wider than the [In-

New York University School of Law et al. by *Burt Neuborne* and *Deborah Goldberg;* for Congresswoman Corrine Brown et al. by *Paul M. Smith, Donald B. Verrilli, Jr.,* and *J. Gerald Hebert;* and for the Lawyers' Committee for Civil Rights Under Law by *Matthew J. Zinn, David A. Stein, James U. Blacksher, Jack W. Londen, Daniel F. Kolb, Norman Redlich, Barbara R. Arnwine, Thomas J. Henderson,* and *Edward Still.*

terstate]–85 corridor. It winds in snakelike fashion through tobacco country, financial centers, and manufacturing areas 'until it gobbles in enough enclaves of black neighborhoods.' Northbound and southbound drivers on [Interstate]–85 sometimes find themselves in separate districts in one county, only to 'trade' districts when they enter the next county. Of the 10 counties through which District 12 passes, 5 are cut into 3 different districts; even towns are divided. At one point the district remains contiguous only because it intersects at a single point with two other districts before crossing over them." 509 U. S., at 635–636 (citations omitted).

The State's 1997 plan altered District 12 in several respects. By any measure, blacks no longer constitute a majority of District 12: Blacks now account for approximately 47% of the district's total population, 43% of its voting age population, and 46% of registered voters. App. to Juris. Statement 67a, 99a. The new District 12 splits 6 counties as opposed to 10; beginning with Guilford County, the district runs in a southwestern direction through parts of Forsyth, Davidson, Rowan, Iredell, and Mecklenburg Counties, picking up concentrations of urban populations in Greensboro and High Point (both in Guilford), Winston-Salem (Forsyth), and Charlotte (Mecklenburg). (The old District 12 went through the same six counties but also included portions of Durham, Orange, and Alamance Counties east of Guilford, and parts of Gaston County west of Mecklenburg.) With these changes, the district retains only 41.6% of its previous area, *id.*, at 153a, and the distance between its farthest points has been reduced to approximately 95 miles, *id.*, at 105a. But while District 12 is wider and shorter than it was before, it retains its basic "snakelike" shape and continues to track Interstate 85. See generally Appendix, *infra.*

Appellees believed the new District 12, like the old one, to be the product of an unconstitutional racial gerrymander.

They filed suit in the United States District Court for the Eastern District of North Carolina against several state officials in their official capacities seeking to enjoin elections under the State's 1997 plan. The parties filed competing motions for summary judgment and supporting materials, and the three-judge District Court heard argument on the pending motions, but before either party had conducted discovery and without an evidentiary hearing. Over one judge's dissent, the District Court granted appellees' motion and entered the injunction they sought. 34 F. Supp. 2d 1029 (EDNC 1998). The majority of the court explained that "the uncontroverted material facts" showed that "District 12 was drawn to collect precincts with high racial identification rather than political identification," that "more heavily Democratic precincts . . . were bypassed in the drawing of District 12 and included in the surrounding congressional districts," and that "[t]he legislature disregarded traditional districting criteria." No. 4:96–CV–104–BO(3) (EDNC, Apr. 14, 1998), App. to Juris. Statement 21a. From these "uncontroverted material facts," the District Court concluded "the General Assembly, in redistricting, used criteria with respect to District 12 that are facially race driven," *ibid.*, and thereby violated the Equal Protection Clause of the Fourteenth Amendment, *id.*, at 22a. (Apparently because the issue was not litigated, the District Court did not consider whether District 12 was narrowly tailored to serve a compelling interest.)[1]

---

[1] In response to the District Court's decision and order, the State enacted yet another districting plan, 1998 N. C. Sess. Laws, ch. 2 (codified at N. C. Gen. Stat. § 163–201(a) (Supp. 1998)), which revised Districts 5, 6, 9, 10, and 12. Under the State's 1998 plan, no part of Guilford County is located within District 12 and all of Rowan County falls within the district's borders. The 1998 plan also modified District 12's boundaries in Forsyth, Davidson, and Iredell Counties. See *ibid.;* see also *Cromartie* v. *Hunt,* No. 4:96–CV–104–BO(3) (EDNC, June 22, 1998), App. to Juris. Statement 178a–179a. The State's 1998 congressional elections were conducted pursuant to the 1998 plan with the District Court's approval. Brief for

The state officials filed a notice of appeal. We noted probable jurisdiction, 524 U. S. 980 (1998), and now reverse.

## II

Our decisions have established that all laws that classify citizens on the basis of race, including racially gerrymandered districting schemes, are constitutionally suspect and must be strictly scrutinized. *Shaw II*, 517 U. S., at 904; *Miller* v. *Johnson*, 515 U. S. 900, 904–905 (1995); *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 227 (1995). When racial classifications are explicit, no inquiry into legislative purpose is necessary. See *Shaw I*, 509 U. S., at 642. A facially neutral law, on the other hand, warrants strict scrutiny only if it can be proved that the law was "motivated by a racial purpose or object," *Miller, supra,* at 913, or if it is "'unexplainable on grounds other than race,'" *Shaw I, supra,* at 644 (quoting *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 266 (1977)); see also *Miller, supra,* at 905, 913. The task of assessing a jurisdiction's motivation, however, is not a simple matter; on the contrary, it is an inherently complex endeavor, one requiring the trial court to perform a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights, supra,* at 266; see also *Miller, supra,* at 905, 914 (citing *Arlington Heights*); *Shaw I, supra,* at 644 (same).[2]

---

Appellees 6, n. 13; App. to Juris. Statement 179a. Because the State's 1998 law provides that the State will revert to the 1997 districting plan upon a favorable decision of this Court, see 1998 N. C. Sess. Laws, ch. 2, § 1.1, this case is not moot, see *City of Mesquite* v. *Aladdin's Castle, Inc.*, 455 U. S. 283, 288–289, and n. 11 (1982); *Zablocki* v. *Redhail*, 434 U. S. 374, 382, n. 9 (1978); *Bullock* v. *Carter*, 405 U. S. 134, 141–142, n. 17 (1972).

[2] Cf. *Reno* v. *Bossier Parish School Bd.*, 520 U. S. 471, 488 (1997) (holding that, in cases brought under § 5 of the Voting Rights Act of 1965, the *Arlington Heights* framework should guide a court's inquiry into whether a jurisdiction had a discriminatory purpose in enacting a voting change); *Rogers* v. *Lodge*, 458 U. S. 613, 618 (1982) (same framework is to be used in evaluating vote dilution claims brought under the Equal Protection Clause).

Districting legislation ordinarily, if not always, classifies tracts of land, precincts, or census blocks, and is race neutral on its face. North Carolina's 1997 plan was not atypical; appellees, therefore, were required to prove that District 12 was drawn with an impermissible racial motive—in this context, strict scrutiny applies if race was the "predominant factor" motivating the legislature's districting decision. To carry their burden, appellees were obliged to show—using direct or circumstantial evidence, or a combination of both, see *Shaw II, supra,* at 905; *Miller,* 515 U. S., at 916—that "the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations," *ibid.*

Appellees offered only circumstantial evidence in support of their claim. Their evidence included maps of District 12, showing its size, shape,[3] and alleged lack of continuity. See Appendix, *infra.* They also submitted evidence of the district's low scores with respect to traditional measures of compactness and expert affidavit testimony explaining that this statistical evidence proved the State had ignored traditional districting criteria in crafting the new Twelfth Congressional District. See App. 221–251. Appellees further claimed that the State had disrespected political subdivisions and communities of interest. In support, they pointed out that under the 1997 plan, District 12 was the only one state-

---

[3] JUSTICE STEVENS asserts that proof of a district's "bizarre configuration" gives rise equally to an inference that its architects were motivated by politics or race. *Post,* at 555. We do not necessarily quarrel with the proposition that a district's unusual shape can give rise to an inference of political motivation. But we doubt that a bizarre shape *equally* supports a political inference and a racial one. Some districts, we have said, are "so highly irregular that [they] rationally cannot be understood as anything other than an effort to 'segregat[e] . . . voters' on the basis of race." *Shaw I,* 509 U. S. 630, 646–647 (1993) (quoting *Gomillion* v. *Lightfoot,* 364 U. S. 339, 341 (1960)).

wide to contain no undivided county and offered figures showing that District 12 gathered almost 75% of its population from Mecklenburg County, at the southern tip of the district, and from Forsyth and Guilford Counties at the northernmost part of the district. *Id.*, at 176, 208–209.

Appellees also presented statistical and demographic evidence with respect to the precincts that were included within District 12 and those that were placed in neighboring districts. For the six subdivided counties included within District 12, the proportion of black residents was higher in the portion of the county within District 12 than the portion of the county in a neighboring district.[4] Other maps and supporting data submitted by appellees compared the demographics of several so-called "boundary segments."[5] This evidence tended to show that, in several instances, the State had excluded precincts that had a lower percentage of black population but were as Democratic (in terms of registered voters) as the precinct inside District 12. *Id.*, at 253–290; 3 Record, Doc. No. 61.

Viewed *in toto*, appellees' evidence tends to support an inference that the State drew its district lines with an im-

---

[4] In the portion of Guilford County in District 12, black residents constituted 51.5% of the population, while in the District 6 portion, only 10.2% of the population was black. App. 179. Appellees' evidence as to the other counties showed: Forsyth District 12 was 72.9% black while Forsyth District 5 was 11.1% black; Davidson District 12 was 14.8% black while Davidson District 6 was 4.1% black; Rowan District 12 was 35.6% black and Rowan District 6 was 7.7% black; Iredell District 12 was 24.3% black while Iredell District 10 was 10.1% black; Mecklenburg District 12 was 51.9% black but Mecklenburg District 9 was only 7.2% black. *Id.*, at 179–181.

[5] Boundary segments, we are told, are those sections along the district's perimeter that separate outside precincts from inside precincts. In other words, the boundary segment is the district borderline itself; for each segment, the relevant comparison is between the inside precinct that touches the segment and the corresponding outside precinct. See App. to Juris. Statement 92a; Brief for United States as *Amicus Curiae* 20, n. 7.

permissible racial motive—even though they presented no direct evidence of intent. Summary judgment, however, is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See *Celotex Corp.* v. *Catrett*, 477 U. S. 317 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242 (1986). To be sure, appellants did not contest the evidence of District 12's shape (which hardly could be contested), nor did they claim that appellees' statistical and demographic evidence, most if not all of which appears to have been obtained from the State's own data banks, was untrue.

The District Court nevertheless was only partially correct in stating that the material facts before it were uncontroverted. The legislature's motivation is itself a factual question. See *Shaw II*, 517 U. S., at 905; *Miller, supra*, at 910. Appellants asserted that the General Assembly drew its district lines with the intent to make District 12 a strong Democratic district. In support, they presented the after-the-fact affidavit testimony of the two members of the General Assembly responsible for developing the State's 1997 plan. See App. to Juris. Statement 69a–84a. Those legislators further stated that, in crafting their districting law, they attempted to protect incumbents, to adhere to traditional districting criteria, and to preserve the existing partisan balance in the State's congressional delegation, which in 1997 was composed of six Republicans and six Democrats. *Ibid.*

More important, we think, was the affidavit of an expert, Dr. David W. Peterson. *Id.*, at 85a–100a. He reviewed racial demographics, party registration, and election result data (the number of people voting for Democratic candidates) gleaned from the State's 1998 Court of Appeals election, 1998 Lieutenant Governor election, and 1990 United States Senate election for the precincts included within District 12 and those surrounding it. Unlike appellees' evidence, which highlighted select boundary segments, appellants' expert

examined the district's entire border—all 234 boundary segments. See *id.*, at 92a. He recognized "a strong correlation between racial composition and party preference" so that "in precincts with high black representation, there is a correspondingly high tendency for voters to favor the Democratic Party" but that "[i]n precincts with low black representation, there is much more variation in party preference, and the fraction of registered voters favoring Democrats is substantially lower." *Id.*, at 91a. Because of this significant correlation, the data tended to support both a political and racial hypothesis. Therefore, Peterson focused on "divergent boundary segments," those where blacks were greater inside District 12 but Democrats were greater outside and those where blacks were greater outside the district but Democrats were greater inside. He concluded that the State included the more heavily Democratic precinct much more often than the more heavily black precinct, and therefore, that the data as a whole supported a political explanation at least as well as, and somewhat better than, a racial explanation. *Id.*, at 98a; see also *id.*, at 87a ("[T]here is at least one other explanation that fits the data as well as or better than race, and that explanation is political identification").

Peterson's analysis of District 12's divergent boundary segments and his affidavit testimony that District 12 displays a high correlation between race and partisanship support an inference that the General Assembly did no more than create a district of strong partisan Democrats. His affidavit is also significant in that it weakens the probative value of appellees' boundary segment evidence, which the District Court appeared to give significant weight. See *id.*, at 20a–21a. Appellees' evidence was limited to a few select precincts, see App. 253–276, whereas Peterson analyzed all 234 boundary segments. Moreover, appellees' maps reported only party registration figures. Peterson again was more thorough, looking also at actual voting re-

sults. Peterson's more complete analysis was significant because it showed that in North Carolina, party registration and party preference do not always correspond.[6]

Accepting appellants' political motivation explanation as true, as the District Court was required to do in ruling on appellees' motion for summary judgment, see *Anderson*, 477 U. S., at 255, appellees were not entitled to judgment as a matter of law. Our prior decisions have made clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact. See *Bush* v. *Vera*, 517 U. S. 952, 968 (1996); *id.*, at 1001 (THOMAS, J., concurring in judgment); *Shaw II, supra*, at 905; *Miller*, 515 U. S., at 916; *Shaw I*, 509 U. S., at 646.[7] Evidence that blacks constitute even a supermajority in one congressional district while amount-

---

[6] In addition to the evidence that appellants presented to the District Court, they have submitted with their reply brief maps showing that in almost all of the majority-Democrat registered precincts surrounding those portions of District 12 in Guilford, Forsyth, and Mecklenburg Counties, Republican candidates were elected in at least one of the three elections considered by the state defendants' expert. Reply Brief for State Appellants 4–8; App. to Reply Brief for State Appellants 1a–10a. Appellants apparently did not put this additional evidence before the District Court prior to the court's decision on the competing motions for summary judgment. They claim excuse in that appellees filed their maps showing partisan registration at the "eleventh hour." Brief for State Appellants 10, n. 13. We are not sure why appellants believe the timing of appellees' filing to be an excuse. The District Court set an advance deadline for filings in support of the competing motions for summary judgment, so appellants could not have been caught by surprise. And given that appellants not only had to respond to appellees' evidence, but also had their own motion for summary judgment to support, one would think that the District Court would not have needed to afford them "an adequate opportunity to respond." *Ibid.*

[7] This Court has recognized, however, that political gerrymandering claims are justiciable under the Equal Protection Clause although we were not in agreement as to the standards that would govern such a claim. See *Davis* v. *Bandemer*, 478 U. S. 109, 127 (1986).

ing to less than a plurality in a neighboring district will not, by itself, suffice to prove that a jurisdiction was motivated by race in drawing its district lines when the evidence also shows a high correlation between race and party preference.

Of course, neither appellees nor the District Court relied exclusively on appellees' boundary segment evidence, and appellees submitted other evidence tending to show that the General Assembly was motivated by racial considerations in drawing District 12—most notably, District 12's shape and its lack of compactness. But in ruling on a motion for summary judgment, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Anderson*, 477 U. S., at 255. While appellees' evidence might *allow* the District Court to find that the State acted with an impermissible racial motivation, despite the State's explanation as supported by the Peterson affidavit, it does not *require* that the court do so. All that can be said on the record before us is that motivation was in dispute. Reasonable inferences from the undisputed facts can be drawn in favor of a racial motivation finding or in favor of a political motivation finding. The District Court nevertheless concluded that race was the "predominant factor" in the drawing of the district. In doing so, it either credited appellees' asserted inferences over those advanced and supported by appellants or did not give appellants the inference they were due. In any event, it was error in this case for the District Court to resolve the disputed fact of motivation at the summary judgment stage. Cf. *ibid.* ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions").[8]

---

[8] We note that *Bush* v. *Vera,* 517 U. S. 952 (1996), *Shaw II*, 517 U. S. 899 (1996), and *Miller* v. *Johnson*, 515 U. S. 900 (1995), each came to us on a developed record and after the respective District Courts had made findings of fact. *Bush* v. *Vera, supra,* at 959; *Vera* v.

Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence. Summary judgment in favor of the party with the burden of persuasion, however, is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact.[9]  That is not to say that summary judgment in a plaintiff's favor will never be appropriate in a racial gerrymandering case sought to be proved exclusively by circumstantial evidence. We can imagine an instance where the uncontroverted evidence and the reasonable inferences to be drawn in the nonmoving party's favor would not be "significantly probative" so as to create a genuine issue of fact for trial. *Id.*, at 249–250. But this is not that case. And even if the question whether appellants had created a material dispute of fact were a close one, we think that "the sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments," *Miller*, 515 U. S., at 916, would tip the balance in favor of the District Court making findings of fact. See also *id.*, at 916–917 ("[C]ourts must also recognize . . . the intrusive potential of judicial intervention into the legislative realm, when assessing . . . the adequacy of a plaintiff's showing at the various stages of litigation and determining whether to permit discovery or trial to proceed").

In reaching our decision, we are fully aware that the District Court is more familiar with the evidence than this Court, and is likewise better suited to assess the Gen-

---

*Richards*, 861 F. Supp. 1304, 1311–1331, 1336–1344 (SD Tex. 1994); *Shaw II, supra*, at 903; *Shaw* v. *Hunt*, 861 F. Supp. 408, 456–473 (EDNC 1994); *Miller* v. *Johnson, supra*, at 910; *Johnson* v. *Miller*, 864 F. Supp. 1354, 1360–1369 (SD Ga. 1994).

[9] Just as summary judgment is rarely granted in a plaintiff's favor in cases where the issue is a defendant's racial motivation, such as disparate treatment suits under Title VII or racial discrimination claims under 42 U. S. C. § 1981, the same holds true for racial gerrymandering claims of the sort brought here. See generally 10B C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §§ 2730, 2732.2 (1998).

eral Assembly's motivations. Perhaps, after trial, the evidence will support a finding that race was the State's predominant motive, but we express no position as to that question. We decide only that this case was not suited for summary disposition. The judgment of the District Court is reversed.

*It is so ordered.*

[Appendix containing North Carolina Congressional District map follows this page.]

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, concurring in the judgment.

The disputed issue of fact in this case is whether political considerations or racial considerations provide the "primary" explanation for the seemingly irregular configuration of North Carolina's Twelfth Congressional District. The Court concludes that evidence submitted to the District Court on behalf of the State made it inappropriate for that Court to grant appellees' motion for summary judgment. I agree with that conclusion, but write separately to emphasize the importance of two undisputed matters of fact that are firmly established by the historical record and confirmed by the record in this case.

First, bizarre configuration is the traditional hallmark of the political gerrymander. This obvious proposition is supported by the work product of Elbridge Gerry, by the "swan" designed by New Jersey Republicans in 1982, see *Karcher* v. *Daggett*, 462 U. S. 725, 744, 762–763 (1983), and by the Indiana plan reviewed in *Davis* v. *Bandemer*, 478 U. S. 109, 183, 185 (1986). As we learned in *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960), a racial gerrymander may have an equally "uncouth" shape. See *id.*, at 340, 348. Thus, the shape of the congressional district at issue in this case provides strong evidence that either political or racial factors motivated its architects, but sheds no light on the question of which set of factors was more responsible for subordinating any of the State's "traditional" districting principles.[1]

---

[1] I include the last phrase because the Court has held that a state legislature may make race-based districting decisions so long as those decisions do not subordinate (to some uncertain degree) " 'traditional . . . districting principles.' " See *Shaw* v. *Hunt*, 517 U. S. 899, 907 (1996); *Miller* v. *Johnson*, 515 U. S. 900, 916 (1995) (holding that racial considerations are subject to strict scrutiny when they subordinate "traditional race-neutral districting principles"); *id.*, at 928 (O'CONNOR, J., concurring) ("To invoke strict

556

Second, as the Presidential campaigns conducted by Strom Thurmond in 1948 and by George Wallace in 1968, and the Senate campaigns conducted more recently by Jesse Helms, have demonstrated, a great many registered Democrats in the South do not always vote for Democratic candidates in federal elections. The Congressional Quarterly recently recorded the fact that in North Carolina "Democratic voter registration edges . . . no longer translat[e] into success in statewide or national races. In recent years, conservative white Democrats have gravitated toward Republican candidates." See Congressional Quarterly Inc., Congressional Districts in the 1990s, p. 549 (1993).[2] This voting pattern

---

scrutiny, a plaintiff must show that the State has relied on race in substantial disregard of customary and traditional districting practices"). In this regard, I note that neither the Court's opinion nor the District Court's opinion analyzes the question whether the "traditional districting principle" of joining communities of interest is subordinated in the present Twelfth District. A district may lack compactness or contiguity—due, for example, to geographic or demographic reasons—yet still serve the traditional districting goal of joining communities of interest.

[2] The Congressional Quarterly's publication, which is largely seen as the authoritative source regarding the political and demographic makeup of the congressional districts resulting from each decennial census, is even more revealing when one examines its district-by-district analysis of North Carolina's partisan voting patterns. With regard to the original First District, which was just over 50 percent black, the book remarks: "The white voters of the 1st claim the Democratic roots of their forefathers, but often support GOP candidates at the state and national level. A fair number are 'Jessecrats,' conservative Democratic supporters of GOP Sen. Jesse Helms." Congressional Quarterly, at 550. The book shows that while the Second and Third Districts have "significant Democratic voter registration edges," Republican candidates actually won substantial victories in four of five recent elections. See id., at 549, 552–553. Statistics also demonstrate that a majority of voters in the Eleventh District consistently vote for Republicans "despite a wide Democratic registration advantage." Id., at 565. Although the book exhaustively analyzes the statistical demographics of each congressional district, listing even the number of cable television subscribers in each district, it does not provide voter registration statistics.

has proved to be particularly pronounced in voting districts that contain more than about one-third African-American residents. See Pildes, The Politics of Race, 108 Harv. L. Rev. 1359, 1382–1386 (1995). There was no need for expert testimony to establish the proposition that "in North Carolina, party registration and party preference do not always correspond." *Ante*, at 551.

Indeed, for me the most remarkable feature of the District Court's erroneous decision is that it relied entirely on data concerning the location of registered Democrats and ignored the more probative evidence of how the people who live near the borders of District 12 actually voted in recent elections. That evidence not only undermines and rebuts the inferences the District Court drew from the party registration data, but also provides strong affirmative evidence that is thoroughly consistent with the sworn testimony of the two members of the state legislature who were most active in drawing the boundaries of District 12. The affidavits of those members, stating that district lines were drawn according to election results, not voter registration, are uncontradicted.[3] And almost all of the majority-Democrat registered precincts that the state legislature excluded from District 12 in favor of precincts with higher black populations produced significantly less dependable Democratic results and actually voted for one or more Republicans in recent elections.

The record supports the conclusion that the most loyal Democrats living near the borders of District 12 "happen to be black Democrats," see *ibid.*, and I have no doubt that the legislature was conscious of that fact when it enacted this apportionment plan. But everyone agrees that that fact is not sufficient to invalidate the district. Cf. *ante*, at 551–552. That fact would not even be enough, under this Court's decisions, to invalidate a governmental action, that, unlike the

---

[3] See App. to Juris. Statement 73a (affidavit of Sen. Roy A. Cooper III, Chairman of Senate Redistricting Committee); *id.*, at 81a–82a (affidavit of Rep. W. Edwin McMahan, Chairman of House Redistricting Committee).

action at issue here, actually has an adverse impact on a particular racial group. See, *e. g., Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256, 279 (1979) (holding that the Equal Protection Clause is implicated only when "a state legislatur[e] selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group"); *Washington* v. *Davis,* 426 U. S. 229 (1976); *Hernandez* v. *New York,* 500 U. S. 352, 375 (1991) (O'CONNOR, J., concurring in judgment) ("No matter how closely tied or significantly correlated to race the explanation for [a governmental action] may be, the [action] does not implicate the Equal Protection Clause unless it is based on race").

Accordingly, appellees' evidence may include nothing more than (i) a bizarre shape, which is equally consistent with either political or racial motivation, (ii) registration data, which are virtually irrelevant when actual voting results were available and which point in a different direction, and (iii) knowledge of the racial composition of the district. Because we do not have before us the question whether the District Court erred in denying the State's motion for summary judgment, I need not decide whether that circumstantial evidence even raises an inference of improper motive. It is sufficient at this stage of the proceedings to join in the Court's judgment of reversal, which I do.