# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-3626

DELORES BRADICH, Administrator of
the Estate of Melvin Bradich,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 00 C 7998—**Charles R. Norgle**, *Judge.*

———————

ARGUED JUNE 7, 2005—DECIDED JULY 1, 2005

———————

Before EASTERBROOK, KANNE, and SYKES, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* When police arrested Melvin Bradich on October 23, 1999, he was drunk—fitting, as the reason for his arrest was a warrant for driving while intoxicated. He was no stranger to the lockup; this was his twenty-fourth arrest. Police booked him and put him in a cell at the stationhouse, pending his arraignment and transfer to the county jail. At this point matters departed from routine, because within 90 minutes Bradich had hanged himself. Officers could not revive him, nor could an emergency medical team dispatched by the fire department.

Delores Bradich, his mother and the administrator of his estate, contends that the arresting officers, the lockup keepers, and the City of Chicago all violated his constitutional rights by failing to protect him from the risk of suicide and react properly once they discovered the hanging. The district court granted summary judgment in defendants' favor, ruling that the Estate has not established that any of them had exhibited deliberate indifference to Bradich's mental-health needs before the hanging or his parlous condition afterward. 2004 U.S. Dist. LEXIS 2478 (N.D. Ill. Feb. 17, 2004).

Many of the Estate's claims can be dispatched swiftly. The arresting officers did not violate any of Bradich's rights by taking him into custody on an outstanding warrant and handing him over at the lockup for detention. The lockup keepers did not display deliberate indifference to a substantial risk of suicide by putting Bradich in a regular cell, and allowing him to keep his civilian clothes, rather than placing him on suicide watch or sending him to a hospital until he sobered up. (On the constitutional deliberate indifference standard for pretrial detainees' medical needs, see *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Matos v. O'Sullivan*, 335 F.3d 553, 556-57 (7th Cir. 2003).) Bradich had been arrested many times before yet never attempted to injure himself, and he did not have a mental-health history implying any disposition toward suicide. That the lockup had experienced two (unsuccessful) suicide attempts by other prisoners during the preceding month does not imply that Bradich posed any elevated risk of suicide.

The Estate contends that intoxication substantially increases the suicide risk but offers no medical or psychiatric evidence to support that proposition. Bradich may have taken barbiturates as well as alcohol (he had some tablets in his pocket when arrested, though no drugs other than alcohol were detected in his blood after his death), but again the Estate does not offer data or expert testimony

suggesting that the combination predisposes to suicide, let alone that the lockup keepers knew of this enhanced risk. We canvassed some of the data in *Jutzi-Johnson v. United States*, 263 F.3d 753 (7th Cir. 2001), and need not repeat what was said there. This is a weaker case (with respect to the events that preceded the hanging) than was *Jutzi-Johnson*, where we held even a negligence standard had not been met.

As for Chicago: municipalities are not vicariously liable under 42 U.S.C. §1983 for their employees' errors. See *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). They are liable only for their own policies. The record in this case shows that some of these policies were not followed—for example, the City's rules called for close monitoring of the cells (intoxicated prisoners must be checked in person or by closed-circuit video every 15 minutes), and the lockup keepers did not follow this rule. The record suggests that they were playing cards and watching television instead of watching the monitors that displayed what the prisoners were doing. None of Chicago's policies is constitutionally inadequate; indeed, the Estate does not take issue with any of them. Its argument, rather, is that Chicago did not ensure that all of its employees followed all of its policies all of the time. That theory of liability is incompatible with *Monell*.

The Estate does not argue that the City *systematically* fails to enforce its written policies and instead maintains informal policies that violate the Constitution. The record does not contain data implying that the suicide rate in Chicago's lockups is abnormally high. The Estate concentrates on the facts of this case, and the employment history of the lockup keepers on duty, rather than anything from which an informal policy of general applicability could be inferred. That one lockup keeper was not retrained according to the City's policies is a shortcoming in the enforce-

ment of sound policies, not an independent violation of the Constitution. See *Collins v. Harker Heights*, 503 U.S. 115, 122-24 (1992).

What happened after the hanging, however, has more potential to produce liability. Officers Hilbring, Simmons, and Walker were on duty in the stationhouse. Simmons and Walker testified by deposition that they noticed Bradich hanging about 6:15 p.m. and ran to his cell. According to their depositions, Bradich appeared to be alive. They had trouble opening the cell door because of the way Bradich had tied the ligature. Simmons obtained a knife from the kitchen, and the officers used this to free Bradich from the ligature and open the cell door. Simmons and Walker were joined by Captain Hilbring, the watch commander, who had come down from the second floor in response to the commotion. Simmons shouted at, slapped, and shook Bradich in an attempt to restart his breathing. (Of the three, only Hilbring has training in cardio-pulmonary resuscitation, and Hilbring did not use his knowledge; shouting, slapping, and shaking are not CPR techniques.) Only after these efforts failed did Walker call for medical personnel. The ambulance was dispatched at 6:25 P.M., implying that the trio at the lockup had waited ten minutes to summon assistance. By the time paramedics reached his cell at 6:34 P.M., Bradich was dead.

These times could be inaccurate. But on summary judgment, when the non-moving party receives the benefit of all reasonable inferences, see *Hunt v. Cromartie*, 526 U.S. 541 (1999), we must assume that the officers took ten minutes to seek help—and that they wasted much of that interval.

Defendants describe themselves as frantically trying to save Bradich during those ten minutes, and this is why the district judge concluded that deliberate indifference had not been established. Maybe it was negligent of officers who did not know (or did not use) CPR techniques to make a rescue attempt, the district judge thought, but the officers were

doing their best. The problem with this view is that it draws inferences in the officers' favor rather than the Estate's.

Why did it take *all three* officers to provide unhelpful assistance? Two might have done what they could, while the third phoned for help (which would take only a minute) and then rejoined the others. Why did two officers who lacked CPR training think that they should shout at a hanging prisoner rather than call for help? Why did the officer with CPR training not use his skills? The Estate's preferred answer is that the three officers are dissembling about their activities during the critical ten minutes. As the Estate sees things, delay in calling for outside assistance was a deliberate choice, not a side effect of devoted rescue attempts.

The Estate believes that the three officers spent most of the ten minutes altering their log books and tidying the cell to disguise their violations of required procedures. Medical personnel found Bradich wearing a T-shirt that the lockup keepers said had been the ligature; this was unusual, to say the least. Perhaps, the Estate suggests, the officers disposed of the actual ligature and other items to hide the fact that they had allowed Bradich too much clothing and other forbidden things in his cell. In this court, defendants say that Bradich had at least three T-shirts, two of which he used to make the ligature; but why was all this clothing in his possession? Some changes were made in the log books during the ten minutes; defendants concede that they noted the suicide attempt in their logs, and if they took the time to do that (itself a violation of regulations) maybe they erased or rearranged other entries to cover the traces of improper conduct following Bradich's arrest. Protecting one's employment interests while an inmate chokes to death would exemplify deliberate indifference to serious medical needs. See *Tlamka v. Serrell*, 244 F.3d 628 (8th Cir. 2001); *Ellis v. Washington County*, 198 F.3d 225 (6th Cir. 1999). That failing would lead to liability if an earlier call for help could have saved Bradich's life, a question on which the evidence

is skimpy. And if the Estate is right about what happened during the ten minutes, the lockup keepers are not entitled to qualified immunity: no reasonable officer could think that the Constitution allowed him to cover up his own misconduct at the expense of a prisoner's life.

Further proceedings may vindicate the lockup keepers' position that the delay was much less than ten minutes and that they provided well-meaning, if inept, care in the interim, but matters are too uncertain to allow summary judgment. The judgment of the district court with respect to Hilbring, Simmons, and Walker is vacated, and the case is remanded for trial. With respect to all other defendants the judgment is affirmed.

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*